AO 91 (Rev. 11/11) Criminal Complaint  AUSA Andrew J. Dixon (312) 371-4231
　　　　　　　　　　　　　　　　　　　　AUSA Megan DeMarco, (312) 371-5698




UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA | CASE NUMBER: 21-cr-00422 |
|---|---|
| v. | |
| MARINA RIVERA | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about July 7, 2021, at Chicago, in the Northern District of Illinois, Eastern Division, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | Knowingly and intentionally possessed with intent to distribute five kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II Controlled Substance |

This criminal complaint is based upon these facts:

   X   Continued on the attached sheet.

　　　　　　　　　　　　　　　　　　　　*Hailey M. Evans /by HKM*
　　　　　　　　　　　　　　　　　　　　HAILEY M. EVANS
　　　　　　　　　　　　　　　　　　　　Task Force Officer, Drug Enforcement Administration (DEA)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: July 8, 2021　　　　　　　　　　　　　　　　　　　　*Heather K. McShain*
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　*Judge's signature*

City and state: Chicago, Illinois　　　　　HEATHER K. MCSHAIN, U.S. Magistrate Judge
　　　　　　　　　　　　　　　　　　　　　　　*Printed name and title*

| | |
|---|---|
| UNITED STATES DISTRICT COURT | |
| NORTHERN DISTRICT OF ILLINOIS | |

## AFFIDAVIT

I, HAILEY M. EVANS, being duly sworn, state as follows:

1. I am a Task Force Officer with the Drug Enforcement Administration ("DEA"). I have been employed by the Village of Lisle Police Department since approximately September 2016, first as a Police Officer and currently as a Detective. Since approximately March 2019, I have been assigned as a Task Force Officer with the DEA Chicago High Intensity Drug Trafficking Agency ("HIDTA") Group 43 located in Chicago, Illinois. As part of my duties as a DEA Task Force Officer, I investigate criminal violations relating to narcotics trafficking offenses, including criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 18, United States Code, Sections 1956, and 1957, and Title 21, United States Code, Sections 841, 843, 846, 848, 952, and 963.

2. This affidavit is submitted in support of a criminal complaint alleging that MARINA RIVERA ("RIVERA")has violated Title 21, United States Code, Section 841(a)(1). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging RIVERA with possession with intent to distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine. I have not included each and every fact known to me concerning this investigation. I have set forth only the facts

that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3. This Affidavit is based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts.

4. Based on the information contained in this Affidavit, I submit that there is probable cause to believe that, on or about July 7, 2021, RIVERA possessed with intent to distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of 21 U.S.C. § 841(a)(1).

**Facts Supporting Probable Cause**

5. Since approximately May 2021, law enforcement has been investigating a drug trafficking organization believed to be involved in the importation and distribution of cocaine and methamphetamine in the greater Chicago area.

6. On or about early July 2021, a confidential law enforcement source ("CS-2")[1] began communicating over WhatsApp with an unknown individual using a Mexican telephone number. In the communications,[2] which were recorded, the

---

[1] Law enforcement arrested CS-2 in May 2021 for a narcotics violation. CS-2 began cooperating with law enforcement thereafter. CS-2 has prior narcotics convictions. CS-2 has provided reliable and accurate information that has led to at least two arrests and a seizure of multiple kilograms of narcotics. No threats or promises have been made to CS-2 regarding his cooperation with law enforcement.

[2] Reference is made to recorded conversations in this Affidavit. In certain instances, these conversations are summarized, translated, and placed in context. My understanding of these conversations is aided by the contents and context of the conversations, my familiarity with the facts and circumstances of this investigation, my experience as a law enforcement officer, my discussions with other law enforcement officers, the experience of other law enforcement

2

individual inquired whether CS-2 was interested in purchasing an available supply of narcotics in the Chicago area. CS-2 responded to the communications indicating that CS-2 was interested and agreed on pricing with the unknown individual. The unknown individual then related to CS-2 that the unknown individual would put CS-2 in contact with the Chicago-based narcotics source.

7. On or about July 6, 2021, at approximately 5:37 p.m., CS-2 received a WhatsApp communication from an unknown female, later identified as RIVERA.[3] During the communication, and subsequent communications that day, which were recorded, RIVERA told CS-2 she had a delivery for CS-2, which CS-2 understood to mean that she had a supply of narcotics available.

8. On or about the afternoon of July 7, 2021, CS-2 and RIVERA had additional recorded communications over WhatsApp in which they made plans to meet at a restaurant near 31st and Pulaski in Chicago around 5:30 p.m.

9. At approximately 5:30 p.m., CS-2 met with law enforcement at a predetermined meet location where CS-2 was searched for contraband or excess currency, with none found. CS-2 was then equipped with covert recording

---

agents and officers in this investigation, and other evidence developed during the course of the investigation. The summaries and translations of recorded conversations herein do not represent finalized transcripts and may not represent the entire conversation that occurred between the identified individuals.

[3] Law enforcement has identified RIVERA as the individual with whom CS-2 was communicating based on the following: law enforcement compared the voice of the individual with whom CS-2 was communicating with the voice of RIVERA during a subsequent in-person interview and confirmed that they were the same individual. Additionally, during the arrest of RIVERA, law enforcement called the number associated with the WhatsApp account that was in communication with CS-2 and observed a phone recovered from RIVERA's person ring.

equipment.[4] CS-2 then travelled from the meet location to the restaurant near 31st and Pulaski while under constant law enforcement surveillance, arriving at approximately 6:00 p.m.

10. According to CS-2, and consistent with surveillance and a live audio recording from CS-2's covert equipment, CS-2 arrived at and entered the restaurant where he met with a female, identified by surveillance as RIVERA. RIVERA and CS-2 briefly communicated before RIVERA provided CS-2 with a small sample of suspect narcotics and exited the restaurant. CS-2 quickly informed law enforcement that the woman he had just met with (RIVERA) had exited the restaurant and was departing in a white KIA, which law enforcement subsequently followed. Law enforcement was able to observe the woman driving (and the sole occupant of) that white Kia and, based on a comparison to a known photograph of RIVERA, identified that individual as RIVERA.

11. CS-2 then departed the restaurant and met with law enforcement, at which time the covert recording equipment was recovered. CS-2 was again searched for contraband and excess currency, with none found, except for the small sample of suspect narcotics which CS-2 indicated that CS-2 had received from RIVERA.

12. At approximately 6:45 p.m., CS-2 had a recorded communication with RIVERA over WhatsApp. During the communication, CS-2 informed RIVERA that CS-2 was interested in purchasing one to two kilograms of narcotics and attempted

---

[4] Law enforcement has not yet reviewed the recordings generated by CS-2's covert recording equipment.

to negotiate the price. RIVERA agreed to provide CS-2 with two kilograms but refused to negotiate on pricing.

13. At approximately 7:37 p.m., surveillance observed RIVERA park outside and enter a residence on the 3200 block of South Komensky in Chicago.

14. At approximately 7:45 p.m., RIVERA sent CS-2 a series of communications over WhatsApp telling CS-2 to travel to the area of the South Komensky address and instructing CS-2 to place the narcotics payment in her white Kia. RIVERA told CS-2 that she would then "leave them there," which CS-2 understood to mean that RIVERA would swap out the money in the Kia for the narcotics.[5]

15. At approximately 7:53 p.m., surveillance observed RIVERA exit the residence on South Komensky carrying a large black purse, enter her white Kia, which was parked across the street, and then walk back to and reenter the South Komensky address without the purse.

16. At approximately 8:10 p.m. CS-2 met with law enforcement at a predetermined meet location where CS-2 was searched for contraband and excess currency, with none found. CS-2 then travelled from the meet location with an undercover law enforcement officer to the area of the house on South Komensky.

17. At approximately 8:16 p.m., as observed by surveillance, CS-2 exited CS-2's vehicle carrying a black duffle bag (which, unbeknownst to RIVERA, was empty),

---

[5] These communications between CS-2 and RIVERA were recorded except for a single communication during which, according to CS-2, RIVERA provided CS-2 with the address of a home nearby the South Komensky address that surveillance observed RIVERA enter.

5

walked to the white KIA, opened the door, and switched out the empty duffle bag for the black purse which surveillance had previously seen RIVERA carrying. CS-2 then reentered CS-2's vehicle, provided the purse to the undercover officer and, with the undercover officer, departed the area. Law enforcement subsequently recovered from the purse two kilogram-sized objects of a substance which later field-tested positive for cocaine.

18. At approximately 8:24 p.m., surveillance observed RIVERA exit the front door of the South Komensky address along with a juvenile and approach the white Kia, at which time RIVERA was taken into custody.

19. Law enforcement then approached the South Komensky address and spoke with the homeowner who initially provided verbal consent for law enforcement to search the house. The homeowner then withdrew consent, and law enforcement officers informed the homeowner that the residence would be secured to allow officers to obtain a search warrant. The homeowner then signed a written consent to search form and authorized law enforcement officers to search the residence. The homeowner further indicated to law enforcement that if there was anything to be found, it would be in the upstairs room where RIVERA, a relative, had been staying while visiting the homeowner on vacation.

20. Law enforcement then searched the bedroom indicated by the homeowner, who further pointed to a suitcase in the room and stated that it belonged to RIVERA. Inside the suitcase, law enforcement found approximately eight kilogram-sized objects of a substance later identified by field-testing as cocaine.

21. After her arrest, RIVERA was informed of her *Miranda* rights, which she waived in writing. In a subsequent interview, she admitted to law enforcement that she was visiting Chicago on vacation and that while here, as a favor to her husband, she had agreed to receive the narcotics which she later provided to CS-2. RIVERA further admitted that she had opened one of the kilograms prior to providing it to CS-2 and observed that it contained a white substance she believed to be cocaine. Law enforcement also found narcotics residue inside the bedroom consistent with RIVERA having opened one of the kilograms.

## Conclusion

22. Based on the foregoing, I believe there is probable cause to believe that, on or about July 7, 2021, RIVERA possessed with intent to distribute five kilograms or more of a mixture or substance containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 841(a)(1).

FURTHER AFFIANT SAYETH NOT.

*Hailey M. Evans /by HKM*
HAILEY M. EVANS
Task Force Officer, Drug Enforcement Administration

SWORN TO AND AFFIRMED by telephone July 8, 2021.

*Heather K. McShain*
Honorable HEATHER K. MCSHAIN
United States Magistrate Judge

7